# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

MR. AND MRS. G., on their own behalf and as
Next Friends of S.G.,

     Plaintiffs,

     v.

CANTON BOARD OF EDUCATION, KEVIN D.
CHASE, JULIE AUSERE, AND PERRI S.
MURDICA,

     Defendants.

No. 3:17-cv-2161 (MPS)

## RULING

S.G., a student who is eligible to receive special education services, along with Mr. and

Mrs. G, her parents, filed suit against the Canton Board of Education ("Board") under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*[1] ECF No. 1.

After an evidentiary hearing spanning several days, a Hearing Officer of the State of Connecticut

Department of Education found that the Board provided a free appropriate public education

("FAPE") during the 2014-2015 and 2015-2016 school years, but did not provide a FAPE during

the 2016-2017 school year. ECF No. 1-1 at 31. She denied the Plaintiffs' request for placement

at Middlebridge School ("Middlebridge"), a private school in Rhode Island, but awarded a

compensatory remedy in the form of additional math instruction for the Board's failure to

provide a FAPE during the 2016-2017 school year. ECF No. 1-1 at 29-31. The Plaintiffs have

---

[1] The complaint also named Kevin D. Chase (Superintendent), Julie Ausere (Chairperson of the
Board), and Perri S. Murdica (Director of Pupil Personnel Services) in their official capacities.
ECF No. 1. However, the Plaintiffs later agreed to remove these individuals as defendants. ECF
No. 53 at 3. The claims against Defendants Chase, Ausere, and Murdica are therefore
DISMISSED and the Clerk is instructed to terminate them from this case.

appealed this award and now move for summary judgment, seeking partial reversal of the

Hearing Officer's decision, residential placement at Middlebridge, and reimbursement for S.G.'s

tuition at Middlebridge. ECF No. 59. The Defendant cross moves for summary judgment to

uphold the administrative decision issued by the Hearing Officer. ECF No. 40. For the reasons

set forth below, the Defendant's motion for summary judgment, ECF No. 40, is GRANTED and

the Plaintiffs' motion for summary judgment, ECF No. 59, is DENIED.

## I. Factual Background

The following facts are taken from the parties' Local Rule 56(a) statements, supporting

exhibits, and the Hearing Officer's Findings of Fact ("FF") where supported by the record.[2]

### A. General Structure of Educational Programming

During the 2013-2014 school year, S.G. attended Canton Intermediate School ("CIS") as

a sixth grader. ECF No. 41-3 at ¶ 1; ECF No. 54 at ¶ 1. She then attended Canton Middle School

("CMS") during the 2014-2015 and 2015-2016 school years for seventh and eighth grade. ECF

No. 41-3 at ¶ 1; ECF No. 54 at ¶ 1.

The teachers at CMS, including the special education teacher, meet daily for

approximately 45 to 50 minutes. ECF No. 41-3 at ¶ 9; ECF No. 54 at ¶ 9. The special education

team—including a speech pathologist, occupational therapist, school psychologist, and special

education teacher—also meets on a regular basis. ECF No. 41-3 at ¶ 9; ECF No. 54 at ¶ 9. Some

of these meetings concerned S.G. ECF No. 41-3 at ¶ 9; ECF No. 54 at ¶ 9. Additionally, Mrs. G

was invited to attend some of these meetings. ECF No. 41-3 at ¶ 9; ECF No. 54 at ¶ 9.

---

[2] The voluminous administrative record, including the hearing exhibits and transcripts, were
manually filed with the Court. ECF No. 31. Exhibit citations use the labels from the underlying
hearing. Transcripts are identified by witness name and page number.

Helen Farmer ("Ms. Farmer") was S.G.'s occupational therapist from first through eighth grade. ECF No. 41-3 at ¶ 45; ECF No. 54 at ¶ 45. She completed an Occupational Therapy Evaluation for S.G. in 2013. ECF No. 41-3 at ¶ 46; ECF No. 54 at ¶ 46; B-5. The evaluation indicates that S.G. has difficulty with balance, bilateral coordination, fine motor skills, visual perception, and visual motor skills, but that her visual perception and visual motor functional skills are better in the school environment than her test scores indicate. B-5 at 4. Ms. Farmer worked with S.G. in both a group setting and an individual setting. ECF No. 41-3 at ¶ 47; ECF No. 54 at ¶ 47; Farmer Tr. 16-17, 21-22. When S.G. moved from elementary to middle school, her occupational therapy time was reduced by 15 minutes. ECF No. 41-3 at ¶ 47; ECF No. 54 at ¶ 47.

In seventh and eighth grade, Christina Olsen ("Ms. Olsen") served as S.G.'s case manager and provided her direct instruction. ECF No. 41-3 at ¶ 26; ECF No. 54 at ¶ 26. Ms. Olsen has a master's degree in Special Education, a Sixth-Year Degree in Educational Leadership, and training in assistive technology. ECF No. 41-3 at ¶ 26; Olsen Tr. 133-34. In eighth grade, Elizabeth Zagata ("Ms. Zagata") taught S.G. math and academic skills while Ms. Olsen continued as her case manager and resource room teacher. ECF No. 41-3 at ¶ 29; ECF No. 54 at ¶ 29. Ms. Zagata is a certified special education teacher, has two master's degrees in education, and is a certified Wilson dyslexia practitioner. ECF No. 41-3 at ¶ 30; Zagata Tr. 61-62, 65.

At CMS, there were between 2 and 5 students in S.G.'s academic skills classes and 20 to 22 students in her general education classes. ECF No. 41-3 at ¶ 34; ECF No. 54 at ¶ 34. There was also a paraprofessional in all her classes. ECF No. 41-3 at ¶ 34; ECF No. 54 at ¶ 34. Throughout her time at CMS, her instructional team used "scaffolding" techniques. ECF No. 41-

3 at ¶ 32; Olsen Tr. 163. This included the use of note-cards to break down assignments into individual steps, written instructions to accompany verbal instructions, a glossary of examples and definitions for math, and brainstorming sessions. ECF No. 41-3 at ¶ 32;  Olsen Tr. 163-65. As her case manager, Ms. Olsen testified that she would facilitate any modifications and accommodations that were needed, coordinate communication with Mr. and Mrs. G, and meet daily with the team of teachers. ECF No. 41-3 at ¶¶ 28, 33; Olsen Tr. 134-35, 138-39. However, S.G.'s tests and quizzes were not always modified, and Ms. Olsen testified that she often encouraged S.G. to try some tests without modifications first. ECF No. 54 at ¶¶ 28, 33; Olsen Tr. 214. She explained that students are "very self-conscious if they're taking a modified test in the regular ed. classroom" and that she would sometimes "say try this in the classroom, see how you do, and you'll have a modified version available to you in the resource room." Olsen Tr. 213-14. She explained that this approach was "more for their own self-esteem and feeling – not wanting to feel separate or different." Olsen Tr. 213-14. S.G. would sometimes take tests in the resource room. ECF No. 41-3 at ¶ 34; ECF No. 54 at ¶ 34.

A child who receives special education services must have an Individualized Education Program ("IEP"). These IEPs contain broad goals that are comprised of objectives, or smaller steps, to help meet those goals. S.G. either mastered or made satisfactory progress on 91% of her IEP objectives in sixth, seventh, and eighth grades. ECF No. 41-3 at ¶ 50. As Mr. and Mrs. G note, however, she only mastered one of seven overarching goals in sixth grade, three of seven in seventh grade, and none in eighth grade. ECF No. 54 at ¶ 50.

## B. S.G.'s Diagnoses

In 2014, Dr. Jessica Lord-Bean ("Dr. Lord-Bean") conducted a neuropsychological evaluation and recommended that S.G.'s primary exceptionality be changed from Learning

Disabled to Multiple Disabilities. ECF No. 41-3 at ¶ 8; ECF No. 54 at ¶ 8. This change was implemented at the December 8, 2014 Planning and Placement Team ("PPT") meeting. ECF No. 41-3 at ¶ 8; ECF No. 54 at ¶ 8; B-15 at 3.

In early 2016, Dr. Cristina Ciocca ("Dr. Ciocca") conducted a neuropsychological evaluation of S.G. Ciocca Tr. 10. She did not contact any school staff to seek their input, B-43 at 6, and the background information for the evaluation was based on conversations with S.G. and Mrs. G, B-42 at 7. Dr. Ciocca stated that S.G.'s "profile was very concordant or consistent with what we see in the nonverbal learning disability." Ciocca Tr. 47. Dr. Ciocca explained that nonverbal learning disability is "not in the [Diagnostic and Statistical] Manual, but it is a recognized disorder." *Id*. at 90-92. She further stated that S.G. had unspecified anxiety disorder and that it was a "subset" of the nonverbal learning disability. ECF No. 54 at ¶ 17; B-42 at 36; Ciocca Tr. 53-54. Dr. Ciocca also diagnosed S.G. with a pragmatic social communication disorder. Ciocca Tr. 116. Vicki Holbrook-Duran ("Ms. Holbrook-Duran"), a speech and language pathologist who worked with S.G for 3.5 years, testified that she did not agree with this diagnosis. ECF No. 41-3 at ¶¶ 2, 23; ECF No. 54 at ¶¶ 2, 23; Holbrook-Duran Tr. 41-42, 94-95.

### C. Assistive Technology

Ms. Farmer testified that the Board "explor[ed] a lot of assistive technology" for S.G. ECF No. 41-3 at ¶ 36; Farmer Tr. 26. When S.G. was younger, they used highlighter strips, colored overlays, and large font because of her visual difficulties, and as she got older they started using text-to-speech and other computer technology. ECF No. 41-3 at ¶ 36; Farmer Tr. 26-27.

At the March 26, 2015 meeting, the PPT discussed additional assistive technology options, including Bookshare, which provided S.G. with electronic access to books. ECF No. 41-

3 at ¶ 38; Olsen Tr. 156. The Board also used different add-ons to the Google Docs platform, including an online thesaurus, grammar check, grammar usage, online writing organizers, and programs that helped S.G. with writing and organization prior to writing. ECF No. 41-3 at ¶ 38; Olsen Tr. 156-57. All students, including S.G., were provided with an e-reader. ECF No. 41-3 at ¶ 39; ECF No. 54 at ¶ 39.

Dr. Lord-Bean and Dr. Ciocca recommended that S.G. undergo an assistive technology evaluation, but the Board did not conduct such an evaluation. ECF No. 54 at ¶ 36; B-14 at 11; B-42 at 38; Murdica Tr. 241.

## D. Speech and Language

Ms. Holbrook-Duran evaluated S.G. in June 2012 and began working with her at the start of the 2012-2013 school year. ECF No. 41-3 at ¶ 2; ECF No. 54 at ¶ 2. She had thirty years of experience as a public school speech and language pathologist. ECF No. 41-3 at ¶ 2; ECF No. 54 at ¶ 2. She drafted and implemented S.G.'s goals and objectives related to speech and language; she also worked with S.G. in a small group. ECF No. 41-3 at ¶ 3; ECF No. 54 at ¶ 3.

When S.G. started seventh grade, her speech services were reduced from 60 to 45 minutes because the transdisciplinary meetings at CMS added levels of involvement to her programming that eliminated the need for the additional fifteen minutes. ECF No. 41-3 at ¶ 11; ECF No. 54 at ¶ 11; Holbrook-Duran Tr. 93. In assessing S.G.'s progress during seventh grade, Ms. Holbrook-Duran noted that S.G. made satisfactory progress in learning to answer inferential questions and mastered how to answer literal questions. ECF No. 41-3 at ¶ 10; B-18 at 35. She further noted that S.G. fell in the low average range for flexible word use and listening for details in listening comprehension; and that she fell in the below average range for synonyms, semantic absurdities, antonyms, and definitions. ECF No. 54 at ¶ 10; B-16 at 1-2. Further testing showed

that S.G. scored in the poor range for phonological awareness and elision; the below average range for blending words, phonological memory, and nonword repetition; and the average range for phoneme isolation, memory for digits, and rapid digit and letter naming. B-16 at 3.

In eighth grade, Ms. Zagata taught S.G.'s academic skills class, which had only one other student, in which she primarily addressed literacy goals around reading and writing. ECF No. 41-3 at ¶ 30. Ms. Zagata regularly met with S.G.'s eighth grade English teacher to ensure that the academic skills class supported her work in English. *Id.* at ¶ 31. Both Ms. Zagata and Ms. Olsen collaborated with S.G.'s English teacher to identify questions ahead of time and prepare S.G. to answer them when called on in class. ECF No. 41-3 at ¶ 35; Olsen Tr. 148-50. Mrs. G testified that she would ask S.G. whether she participated in class and estimated that "over the course of the year there was maybe four or five questions done." ECF No. 54 at ¶ 35; Mrs. G Tr. 59.

In early 2016, Ms. Holbrook-Duran assessed S.G.'s language and phonological processing skills as they related to her reading. ECF No. 41-3 at ¶ 21; ECF No. 54 at ¶ 21. This included a formal observation of S.G. analyzing *To Kill a Mockingbird* with a group of other students in her English class. ECF No. 41-3 at ¶ 21; ECF No. 54 at ¶ 21. Ms. Holbrook-Duran determined that S.G. successfully handled this assignment. ECF No. 41-3 at ¶ 21; Holbrook-Duran Tr. 40; B-37 at 5. She noted that S.G.'s overall language skills "fell in the below average range." B-37 at 5. More specifically, S.G. "demonstrated listening comprehension skills that generally fell in the average range," her "vocabulary skills ranged from average to below average," and her "phonological processing skills indicated phonological awareness skills that were slightly below average." B-37 at 5. Although still below average, her phonological processing skills had improved from the last assessment. B-37 at 5. S.G.'s conversation skills were judged to be adequate with regard to topic initiation, maintenance, and closure. ECF No.

41-3 at ¶ 22; Holbrook-Duran Tr. 41. And her strengths included synonym naming, associations, and flexible word usage. B-37 at 5.

### E. Social Skills and Anxiety

A 2012 assessment indicated that S.G. did not have anxiety. ECF No. 41-3 at ¶ 17; B-15 at 7. Ms. Olsen testified that S.G. seemed to experience only an average level of anxiety. Olsen Tr. 143. However, S.G.'s IEPs from seventh grade onward document anxiety as a concern on the "Present Level of Performance" pages, and she was diagnosed with an unspecified anxiety disorder by Dr. Ciocca in 2016. ECF No. 54 at ¶ 17; B-18 at 7; B-19 at 7; B-26 at 7; B-39 at 5; B-43 at 10; B-42 at 36.

CMS school psychologist Amy Nadeau was responsible for drafting S.G.'s social and emotional goals; she introduced one goal in seventh grade and this goal continued in eighth grade. ECF No. 41-3 at ¶ 14; ECF No. 54 at ¶ 14. After the December 2014 PPT meeting, which took place during S.G.'s seventh grade year, Ms. Nadeau began working with S.G. in individual and group settings. ECF No. 41-3 at ¶ 12; ECF No. 54 at ¶ 12. In the group meetings, they worked on being assertive, responding to peer pressure and using constructive rather than deconstructive comments and judgments, stress management, coping skills, and dealing with everyday stressors. ECF No. 41-3 at ¶ 12; ECF No. 54 at ¶ 12. This social skills group was not included in S.G.'s IEPs, but students did not require an IEP to participate in the social skills group as it was a regular-education intervention. ECF No. 41-3 at ¶ 13; ECF No. 54 at ¶ 13-14; Nadeau Tr. 28, 108. Ms. Nadeau testified that she recommended this group to S.G. because she thought "there might be some misunderstanding or some underlying anxiety" that was preventing S.G.'s participation in classes. ECF No. 54 at ¶ 13; Nadeau Tr. 28. Near the end of S.G.'s eighth-grade year, Ms. Nadeau testified that her participation in the group sessions "was strong." ECF

No. 41-3 at ¶ 20; Nadeau Tr. 45-46. S.G. was also participating in a small group speech and language session with two other students with whom she interacted in a "[v]ery positive, very engaged" manner. ECF No. 41-3 at ¶ 20; Holbrook-Duran Tr. 43.

Ms. Nadeau testified that S.G. would continue to need someone to work with her on social skills in high school, but social skills were not included in the IEP for the next year. ECF No. 54 at ¶ 20; Nadeau Tr. 45, 95. However, her ninth grade IEP did include a counseling goal with two objectives: requesting assistance when needed and identifying three strengths and weaknesses in her learning process. ECF No. 54 at ¶ 14; B-43 at 19; Nadeau Tr. 94. Ms. Nadeau explained that S.G. would be implementing as well as naming coping strategies as part of this goal. Nadeau Tr. 117.

Mrs. G testified that S.G. had trouble socially. She explained that S.G. did not have friends; that a group of peers did not invite S.G. to go trick-or-treating with them in seventh grade; that there was a particular student in some of S.G.'s classes who bullied her; and that S.G. was coerced by her peers into creating a fake Instagram account that later got her suspended. ECF No. 54 at ¶¶ 15, 43; Mrs. G Tr. 18-20, 70-71, 76. Ms. Nadeau testified that S.G. exhibited some anxiety related to a fieldtrip and a community day. ECF No. 54 at ¶ 19; Nadeau Tr. 81-82, 99.

However, in school, Ms. Nadeau testified that she saw S.G. on a regular basis in the hallways and in the cafeteria and witnessed her interacting with other students. ECF No. 41-3 at ¶ 14; ECF No. 54 at ¶ 14; Nadeau Tr. 15. She further testified that S.G. and her friends would come into her office and talk about their texting, and that one of these students stated that she FaceTimed with S.G. on a nightly basis. ECF No. 41-3 at ¶ 15; Nadeau Tr. 15-16. Ms. Nadeau also stated that S.G. was part of a group of 8-10 students who would sit together at lunch. ECF

No. 41-3 at ¶ 15; Nadeau Tr. 16. Ms. Holbrook-Duran also testified that she always saw S.G. with peers, rather than isolated, at school. ECF No. 41-3 at ¶ 16; Holbrook-Duran Tr. 44. Ms. Zagata testified that when she saw S.G. around the school, she was "happy and being socially appropriate in the hallways, engaged with her peers." ECF No. 41-3 at ¶ 43; Zagata Tr. 88. Ms. Olsen noted that S.G. "always had a group of kids, girls, that she would walk through the hallways with" and that she "generally had three or so close friends that she was typically seen with in the morning before school." ECF No. 41-3 at ¶ 43; Olsen Tr. 151.

### F. Memory

Following a February 2013 psychoeducational evaluation, school psychologist John Pierce reported that S.G.'s memory skills fall in the borderline range of functioning and she would have significant difficulty recalling new information, regardless of how novel it is, unless it is repeated to her. ECF No. 41-3 at ¶ 4; ECF No. 54 at ¶ 4; B-4 at 4-5. Ms. Olsen also testified that "if things weren't repeated consistently, sometimes she might forget them" and that S.G. "presented with weak memory skills, so it was a little more complex to work with her sometimes, . . . and she would remember, but she wouldn't always know how to apply skills that she had learned." ECF No. 41-3 at ¶ 6; ECF No. 54 at ¶ 6; Olsen Tr. 142-43. In a September 2014 neuropsychological evaluation report, Dr. Lord-Bean noted that S.G. learns best "when information is presented in a repetitive and sequential fashion." ECF No. 41-3 at ¶ 5; ECF No. 54 at ¶ 5; B-14 at 10. Ms. Holbrook-Duran explained that, in practice, it is "like a spiral therapeutic approach where you're constantly moving forward, but you may have to go back and revisit a previously taught concept to make sure that it is – there's a solid foundation in place as you're – as you're continuing to move forward." ECF No. 41-3 at ¶ 5; Holbrook-Duran Tr. 29-30.

### G. Math

In both the seventh and eighth grades, S.G.'s IEP provided for 45 minutes of math instruction per day in a special education small group setting. ECF No. 1-1 at (FF) ¶¶ 14, 38. In seventh grade, her IEP included two math-related objectives and she mastered both. ECF No. 1-1 at 32. The Hearing Officer also found that she made significant progress in math in seventh grade. ECF No. 1-1 at FF ¶ 26. In eighth grade, S.G.'s IEP reflected mastery of one math-related objective and satisfactory progress on two math-related objectives. ECF No. 1-1 at 37. However, the Hearing Officer found that "the evidence presented at the hearing was inconclusive" as to whether S.G. actually progressed in math in eighth grade. ECF No. 1-1 at FF ¶ 68. Ms. Olsen testified that S.G.'s math profile was complicated and that it was "not fair to put her in a [particular] grade level, because she could do some things that were on grade level or above grade level . . . and then there were things that she continued to struggle with." Olsen Tr. 195.

### H. Ninth Grade

For the most part, S.G.'s ninth grade IEP continued to recommend similar instructional and related service delivery as was used in the previous two grades. ECF No. 1-1 at FF ¶ 98. However, there were two changes. First, the ninth grade IEP eliminated specialized instruction in math. ECF No. 1-1 at FF ¶ 100. Instead, S.G. would be placed in an algebra class co-taught by a special education teacher and a regular education teacher. ECF No. 1-1 at FF ¶ 101; Olsen Tr. 232. The class would cover only one half of the year's algebra curriculum, would review some concepts from the previous year, and would only include 13 students. Olsen Tr. 231. Second, the ninth grade IEP reduced S.G.'s occupational therapy time. ECF No. 1-1 at FF ¶ 103; ECF No. 41-3 at ¶ 48.

In 2016, Dr. Ciocca administered a neuropsychological evaluation; Mr. and Mrs. G retained Dr. Ciocca and the Board funded the evaluation. ECF No. 41-3 at ¶ 54; ECF No. 54 at ¶ 54; Ciocca Tr. 73-74; B-42. On the basis of her evaluation, Dr. Ciocca recommended Middlebridge School and a few other educational programs for S.G. Ciocca Tr. 63; ECF No. 41-3 at ¶ 54; ECF No. 54 at ¶ 54. At the June 3, 3016 PPT, Mr. and Mrs. G rejected the proposed ninth grade IEP and requested placement at a private school. ECF No. 1-1 at FF ¶ 107; B-43 at 6. The school staff disagreed with the request for a private school placement. ECF No. 1-1 at FF ¶ 107; B-43 at 6. Mr. and Mrs. G then unilaterally placed S.G. at Middlebridge School for the 2016-2017 school year. ECF No. 41-3 at ¶ 51, 55-57; ECF No. 54 at ¶ 51, 55-57.

Middlebridge did not apply to be on the state of Rhode Island's list of approved special education schools. ECF No. 54 at ¶ 52; Leventhal Tr. 56-57. The primary instructional contacts at Middlebridge are tutors who must have a bachelor's degree. ECF No. 41-3 at ¶ 53; ECF No. 54 at ¶ 53; Leventhal Tr. 46. In addition, the tutors are working toward an associate's level in Orton Gillingham reading instruction; however, the tutor working with S.G. had not obtained the certification despite having sought it for four years. ECF No. 41-3 at ¶ 53; ECF No. 54 at ¶ 53; Leventhal Tr. 47, 49.

## I. Administrative Decision

On September 16, 2016, Mr. and Mrs. G requested an administrative special education due process hearing from the State of Connecticut Department of Education. ECF No. 41-3 at ¶ 58; ECF No. 54 at ¶ 58. The hearing began on April 7, 2017 and continued over five subsequent days; the last day of the hearing was held on July 12, 2017.  ECF No. 41-3 at ¶ 58; ECF No. 54 at ¶ 58. Over the course of the hearing, ten witnesses testified, the Plaintiffs introduced 95 exhibits, and the Board introduced 56 exhibits. ECF No. 41-3 at ¶ 58; ECF No. 54 at ¶ 58.

On November 1, 2017, the Hearing Officer issued a 47-page, single-spaced final decision

and order, including findings of fact, conclusions of law, and additional addenda in which she

summarized S.G.'s goals and objectives over three years of IEPs, as well as S.G.'s test scores.

ECF 1-1. In sum, the Hearing Officer held as follows:

> The Board provided the Student a free appropriate public education for the 2014-2015
> and 2015-2016 School Years.

> The Board did not offer the Student a free appropriate public education for the 2016-2017
> School Year.

> The Student does not require a residential placement, and Middlebridge School is not
> appropriate as a day placement.

> The Student is entitled to compensatory education services in the form of specialized
> instruction in mathematics at the rate of .80 hours for each day that school was in session
> during the 2016-2017 School Year.

ECF 1-1 at 32. This action followed.

## II. Legal Standards

Under the IDEA, "Congress provides federal funds to those states that develop plans to

assure 'all children with disabilities the right to a free appropriate public education.'" *Walczak v.

Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (quoting 20 U.S.C. § 1412(1)). A

FAPE "must include special education and related services tailored to meet the unique needs of a

particular child, and be reasonably calculated to enable the child to receive educational

benefits." *Id.* (internal quotation marks and citations omitted).

Summary judgment in the IDEA context "involves more than looking into disputed issues

of fact; rather, it is a pragmatic procedural mechanism for reviewing administrative decisions."

*A.C. ex rel. M.C. v. Bd. of Educ. of The Chappaqua C. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir.

2009) (internal quotation marks omitted). The IDEA left the "primary responsibility for

formulating the education to be accorded a handicapped child, and for choosing the educational method most suitable to the child's needs, . . . to state and local educational agencies in cooperation with the parents or guardian of the child." *Bd. of Educ. of Hendrick Hudson C. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982). As such, "the role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed" and they must give "due weight" to the administrative proceeding below. *Gagliardo v. Arlington C. Sch. Dist.*, 489 F.3d 105, 112-113 (2d Cir. 2007) (internal quotation marks and citation omitted). So, while a federal court "must engage in an independent review of the administrative record and make a determination based on a preponderance of the evidence," it must also be "mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* at 112-13 (internal quotation marks, citations, and alterations omitted).

"The standard of review requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete *de novo* review." *C.F. ex rel. R.F. v. New York City Dept. of Educ.*, 746 F.3d 68, 77 (2d Cir. 2014) (internal quotation marks and citation omitted). "The deference owed depends on both the quality of the opinion and the court's institutional competence." *Id.* Deference to the decision reached in the administrative proceeding is particularly warranted where, as here, the Court's decision is based only on the administrative record. *Gagliardo*, 489 F.3d at 113. "The party appealing [a Hearing Officer's] determination bears the burden of proof in establishing that the [Hearing Officer's] decision is not entitled to deference." *J.C. ex rel. C.C. v. New York City Dept. of Educ.*, 2015 WL 1499389, at *14 (S.D.N.Y. Mar. 31, 2015), *aff'd sub nom. J.C. v. New York City Dept. of Educ.*, 643 Fed. Appx. 31 (2d Cir. 2016)(unpublished).

## III.  Discussion

The Plaintiffs argue that the Board denied S.G.'s right to a FAPE by committing both procedural violations, ECF No. 60 at 16-23, and substantive violations under the IDEA, *id*. at 23-36. They further argue that the Hearing Officer's award of compensatory education was inadequate, and that Middlebridge School is the appropriate placement for S.G. *Id*. 36-39. They seek compensatory education, residential placement at Middlebridge, and tuition reimbursement. ECF No. 1 at 51.

To determine whether the Plaintiffs are entitled to such relief, the Court undertakes a three-step process: "First, we consider whether the school district has complied with the IDEA's procedural requirements. Next, we ask whether the IEP is reasonably calculated to enable the child to receive educational benefits. If the answer to either of those questions is 'no,' we then ask whether the private schooling obtained by the parents is appropriate to the child's needs." *T.Y., K.Y. on behalf of T.Y. v. New York City Department of Education*, 584 F.3d 412, 417 (2d Cir. 2009) (internal quotation marks and citations omitted).

### A.  Procedural Compliance

The Plaintiffs allege a host of procedural violations in this case. After setting forth the legal standards applicable to procedural claims, I address each claim below.

"The initial procedural inquiry in an IDEA case is no mere formality, as adequate compliance with the procedures prescribed would in most cases assure much if not all of what Congress wished in the way of substantive content in an IEP." *A.C. ex rel. M.C.*, 553 F.3d at 172 (internal quotation marks and citations omitted). "Procedurally, an IEP must contain: (1) the student's present levels of academic achievement and functional performance; (2) measurable annual goals for the student; (3) the method used to measure the student's progress toward those

goals; (4) the special education and related services that the IEP recommends; (5) an explanation of the extent to which the student will be educated with 'nondisabled' peers; (6) the reasons for any alternative assessments; and (7) the start date for recommended services, their duration, and their frequency." *R.C. ex rel. M.C. v. Byram Hills Sch. Dist.*, 906 F. Supp. 2d 256, 268 (S.D.N.Y. 2012) (citing 20 U.S.C. § 1414(d)(1)(A)).

However, "it does not follow that every procedural error in the development of an IEP renders that IEP legally inadequate under the IDEA." *Grim v. Rhinebeck C. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003). "A procedural error will only render an IEP legally inadequate if the alleged inadequacies, '(i) impeded the child's right to a [FAPE]; (ii) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child; or (iii) caused a deprivation of benefits.'" *R.C. ex rel. M.C.*, 906 F. Supp. 2d at 268 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

### 1. Appropriate Data

The Plaintiffs allege that the Board failed to provide appropriate data. First, the Plaintiffs state that "[t]he Board failed to collect data which [led] to inaccurate reporting and . . . inappropriate IEPs for 7th, 8th, and 9th grade. . . the failure to provide any data was a violation of FAPE." ECF No. 1 at ¶ 164. The Hearing Officer addressed this concern as follows:

> 25. . . . The evidence reflects, however, that the Student's PPT collected a great deal of data to support its progress reports in the seventh and eighth grades. This included scores on standardized tests such as the Woodcock Johnson Test of Achievement III and IV, the Weschler Individual Achievement Test, the Grey Oral Reading Test, the Test of Written Language, the Comprehensive Test of Spoken Language, the Word Test, the Listening Comprehension Test, the Comprehensive Test of Phonological Processing, the Clinical Evaluation of Language Fundaments, the Bruininks-Oseretsky Test of Motor Proficiency, and the Test of Visual Perception Skills, as well as curricular based materials and clinical observations (FF 28 - 31, 49, 56 - 74).

ECF No. 1-1 at ¶ Conclusions of Law (CL) 25. Although the Plaintiffs state that the Board failed "to provide <u>any</u> data," ECF No. 1 at ¶ 164, they only identify one set of scores—the "Wilson scores"—that were missing. ECF No. 60 at 17. Not only did the Board administer another Wilson test, B-18 at 24, but as noted by the Hearing Officer, it also collected a host of other data. *See, e.g.*, ECF No. 1-1 at ¶ CL 25; *id.* at FF ¶¶ 27-28, 49, 56-60, 63, 67, 69, 73, 74. One set of missing scores, in light of all the other available data, does not impede the right to a FAPE or otherwise render an IEP inadequate.[3]

Second, the Plaintiffs argue that it was "clearly erroneous" for the Hearing Officer to find that data collection was unnecessary for simple objectives. ECF No. 1 at ¶ 165. In her decision, the Hearing Officer explained that "[w]here data was not collected to measure objectives, the objectives were so simple that data collection was not necessary to support the measurement, such as the objective to name three strategies." ECF No. 1-1 at ¶ 26. Here, progress on simple goals was measured and reported through testimony by the school psychologist, the occupational therapist, and the speech-language therapist. ECF No. 1-1 at FF ¶¶ 69, 71, 72. As noted by the Hearing Officer, this is sufficient. ECF No. 1-1 at ¶ 26; *see also N.S. v. New York City Dept. of Educ.*, 2014 WL 2722967, at *9 (S.D.N.Y. June 16, 2014) (explaining that goals to "improve readiness skills by identifying colors, numbers, [and] shapes with 80% accuracy as measured monthly by her teacher" are "inherently measurable"). Further, "the sufficiency of goals and strategies in an IEP is precisely the type of issue upon which the IDEA requires deference to the

---

[3] The Plaintiffs also appear to argue that the failure to produce raw data at the hearing was a procedural violation. ECF No. 60 at 17. However, the Board was not required to produce such data at the hearing. ECF No. 1-1 at CL ¶¶ 27-29. And data about S.G.'s progress, including test scores, were included in the IEPs and routinely provided to the parents, as discussed below.

expertise of the administrative officers." *Grim*, 346 F.3d at 382; *see also A.M. ex rel. Y.N. v. New York City Dept. of Educ.*, 964 F. Supp. 2d 270, 285 (S.D.N.Y. 2013) (explaining that "deference is especially appropriate" where the administrative officers conclude "that the goals were sufficient and measurable"). Thus, the Board's practices regarding data provision do not constitute a denial of FAPE.

### 2. Parental Participation

The Plaintiffs argue that the Board denied parental participation because "they were not provided the data that demonstrated regression or that S.G. was struggling," ECF No. 60 at 17; their "concerns were repeatedly ignored," ECF No. 1 at ¶ 157; the "recommendations of the neuropsychologist were not actually considered," *id.*; and "placement at Canton High [S]chool was predetermined with no other options discussed or considered," *id*. Contrary to these assertions, a review of the record demonstrates that the school staff updated the parents about S.G.'s progress, responded to parental concerns, and provided the parents a meaningful opportunity to participate in decisions.

"Under the law, parents must be given the opportunity to meaningfully participate in the IEP development process. However, as long as the parents are listened to, this burden is met even if the [school] ultimately decides not to follow the parents' suggestions." *E.F. v. New York City Dept. of Educ.*, 12-CV-2217 MKB, 2013 WL 4495676, at *17 (E.D.N.Y. Aug. 19, 2013) (internal quotation marks, citations, and alterations omitted). Parents are given the opportunity to meaningfully participate if they have an "opportunity to examine records, participate in meetings, and to obtain an independent evaluation." *Dzugas-Smith v. Southold Union Free Sch. Dist.*, 2012 WL 1655540, at *27 (E.D.N.Y. May 9, 2012). Having reviewed the record, the Court

finds no basis for the parents' contention that they were denied a meaningful opportunity to participate in developing S.G.'s IEP.

First, the parents were regularly provided data and other information about their daughter's progress. For instance, at the February 2015 PPT meeting, at which Mrs. G was present, the team reviewed the results of GORT testing, achievement testing, and speech and language testing. B-18 at 3. The following month, the staff convened another meeting with Mrs. G to answer her questions about the February PPT, including several questions about how S.G.'s progress would be monitored. B-19 at 3-4. In response to one of Mrs. G's questions, the staff changed the relevant measurement criteria, and when Mrs. G asked how a particular objective would be measured, Mrs. Olsen explained that "data is taken in the classrooms where [S.G.] is and reflected in progress report[s] quarterly." B-19 at 3-4. Additionally, Mrs. G frequently emailed school staff with concerns, requests, and suggestions, and the staff were very responsive. *See, e.g.*, B-24, B-28. The record therefore demonstrates the responsiveness of school staff to parental concerns about how their daughter was doing and how her progress was being monitored.

Second, and as noted by the Hearing Officer, the Board responded to parental concerns about S.G.'s educational and social progress. For instance, in response to a parental concern about S.G.'s reading progress:

> The PPT agreed to engage a reading specialist, who assessed the Student and made recommendations early in the eighth grade. The specialist recommended against introduction of another systematic, structured reading program because the Student's fluency skills were already strong. Instead, she recommended that the teachers focus on reading comprehension strategies during the academic skills and resource classes. (FF 48 - 50) The parental concern was not ignored.

ECF No. 1-1 at CL ¶ 20. And regarding parental concerns about anxiety, the Board added "services in the form of an informal social group in seventh grade and then counseling with the school psychologist in the eighth and ninth grades." ECF No. 1-1 at CL ¶ 21.

Third, the parents' contention that the "recommendations of the neuropsychologist were not actually considered" is belied by the record. The record shows that the PPT reviewed Dr. Ciocca's report just a few weeks after receiving it. B-43. At the meeting, the parents and the school staff discussed each of the 22 school-based recommendations in the report. B-43 at 5-6. The PPT agreed with some of the recommendations and felt that they had already been implemented. For instance, the team agreed with Recommendation 2 that S.G.'s identifying disability should remain multiple disabilities. B-42 at 36; B-43 at 5. The team also agreed with Recommendation 8 that S.G. requires programming to help her self-monitor and better understand her strengths and weaknesses; indeed, Ms. Nadeau discussed a program that S.G. already completed on this topic, the progress she made in this area, and the continued instruction that would be provided in ninth grade. B-42 at 37; B-43 at 5. The team discussed Recommendations 15 and 20, which related to reading evaluation and instruction, and noted that extensive reading evaluations had been completed the previous year and that the area in which S.G. required the most assistance was reading comprehension. B-42 at 38; B-43 at 5-6. The PPT also disagreed with some of Dr. Ciocca's recommendations. For instance, the team expressed concern about Recommendations 3, 4, and 7 because they suggested grouping S.G. with students with similar disabilities, and the team felt this was unduly restrictive. B-42 at 36-37; B-43 at 5. The PPT notes that "[s]everal times throughout the review of the recommendations, [Mr. and Mrs. G] were asked if they had comments or questions," but "[n]one were indicated." B-43 at 6.

Fourth, as to S.G.'s placement, the record does not support the parents' contention that "placement at Canton High school was predetermined with no other options discussed or considered." ECF No. 1 at ¶ 157. It was only at the PPT meeting on June 3, 2016 that the parents requested a private school placement. B-43 at 6. The school team disagreed and explained its position that the proposed program for ninth grade at Canton High School was "a strong one and more than adequate to meet [S.G.'s] educational needs." B-43 at 6. "The fact that the District staff ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate . . . or that the outcome of the [ ] meeting was pre-determined*." Dirocco ex rel. M.D. v. Bd. of Educ. of Beacon City Sch. Dist.*, 2013 WL 25959, at *20 (S.D.N.Y. Jan. 2, 2013) (internal quotation marks and alterations omitted). "A professional disagreement is not an IDEA violation." *Id.* (internal quotation marks omitted). Here, the school staff reviewed the independent evaluation by Dr. Ciocca and considered the parents' placement request, but did not agree with the placement recommendation based on their experience with S.G. and evaluations of her development. B-43 at 6.

While the parents were not provided with everything they requested, they were certainly given the opportunity to meaningfully participate in the decision-making process.

### 3. PPTs

The Plaintiffs argue that "the Board failed to call a PPT when it was clear that S.G. was not making progress." ECF No. 60 at 17. In *Rowley*, the Supreme Court explained that the IEP and the personalized instruction must be "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207. To further this this goal, a student's IEP should be reviewed and revised, as needed, to address "[a]ny lack of expected progress toward the

annual goals." 34 C.F.R. § 300.324(b)(1)(ii)(A). Here, S.G. made sufficient progress during the

year and did not require additional PPT meetings.

The Plaintiffs note that "S.G. did not master any of her IEP goals for the 2015-2016

school year." ECF No. 60 at 17. While this is true , S.G. achieved a progress level of

"satisfactory" on all of her IEP goals for that year. ECF No. 1-1 at 36-39. And she either

mastered or made satisfactory progress on 20 of the 22 objectives, receiving a progress level of

"other" on one writing objective, and a progress level of "unsatisfactory" on one objective

related to learning new tasks. ECF No. 1-1 at 37, 39. Other metrics further support the finding

that S.G. made meaningful progress and did not require the school to call additional PPTs. *See*

Section III.B.

### 4. Technology Evaluation and Social/Emotional Testing

The Plaintiffs argue that the Board committed another procedural violation and denied

S.G. FAPE when it "failed to conduct an assistive technology evaluation" and when it "failed to

conduct social and emotional testing."  ECF No. 60 at 18-19. Having reviewed the record in this

case, however, the Court agrees with the Hearing Officer that neither assistive technology nor

social/emotional testing was required to provide S.G. with a FAPE.

The Hearing Officer found that an assistive technology evaluation was not necessary

because S.G. "was making adequate progress on her goals and objectives as well as in the

general curriculum." ECF No. 1-1 CL ¶ 12. In making this finding, she followed the procedure

set forth in the Connecticut State Department of Education's *Connecticut Assistive Technology*

*Guidelines for Ages 3-21*:

> [T]he first inquiry in consideration whether assistive technology should be included in a
> student's IEP is: "Is the student making adequate progress on IEP goals/objectives
> through task modifications or accommodations, skill remediation and/or other

interventions?" If so, the PPT need not take any further steps in this regard, including performing an assistive technology evaluation."

ECF No. 1-1 CL ¶¶ 10-11. In this case, the record supports the finding that S.G. made meaningful progress on her goals and objectives during the seventh and eighth grades. ECF No. 1-1 at 32-39; Section III.B. As such, even though Dr. Lord-Bean and Dr. Ciocca recommended an assistive technology evaluation, B-14 at 11; B-42 at 38, it was not required. *See J.C. ex rel. C. v. New Fairfield Bd. of Educ.*, 2011 WL 1322563, at *18 (D. Conn. Mar. 31, 2011) ("[A]lthough assistive technology will almost always be beneficial, a school is only required to provide it if the technology is necessary. Moreover, the failure to provide assistive technology denies a student FAPE only if the student could not obtain a meaningful benefit without such technology."). In any case, S.G.'s occupational therapist noted that the school was "exploring a lot of assistive technology" for S.G, ECF No. 41-3 at ¶ 36. And it was already using text-to-speech technology, an e-reader, an online thesaurus, grammar check, grammar usage, online writing organizers, and programs that helped S.G. with writing and organization prior to writing. ECF No. 41-3 at ¶¶ 36, 38, 39; ECF No. 54 at ¶ 39; Farmer Tr. 26-27; Olsen Tr. 156-57.

With regard to social and emotional testing, the Plaintiffs note that S.G.'s IEPs from seventh grade onward document anxiety as a concern on the "Present Level of Performance" pages, and that Dr. Ciocca diagnosed her with an unspecified anxiety disorder in 2016. ECF No. 54 at ¶ 17; B-18 at 7; B-19 at 7; B-26 at 7; B-39 at 5; B-43 at 10; B-42 at 36. In addition, Mrs. G testified that S.G. had trouble socially. ECF No. 54 at ¶¶ 15, 43; Mrs. G Tr. 18-20, 70, 76. However, Dr. Ciocca never observed S.G. in the school environment, and the school staff testified that S.G. exhibited good social skills and had friends in school. Nadeau Tr. 15-16 (testifying that she saw S.G. interacting with other students, that S.G. and her friends would come into her office and talk about their texting and FaceTiming, and that S.G. was part of a

23

group of 8-10 students who would sit together at lunch); Holbrook-Duran Tr. 44 (testifying that

she always saw S.G. with peers at school); Zagata Tr. 88 (testifying that when she saw S.G.

around the school, she was "happy and being socially appropriate in the hallways, engaged with

her peers"); Olsen Tr. 151 (testifying that S.G. "always had a group of kids, girls, that she would

walk through the hallways with" and that she "generally had three or so close friends that she

was typically seen with in the morning before school"). After reviewing the evidence, the

Hearing Officer found and that "[S.G.'s] anxiety, if any, was not sufficient to require further

evaluation or services in order for [her] to receive FAPE." ECF No. 1-1 CL ¶ 18.

The Plaintiffs dispute this finding and point to *L.O. v. New York City Dep't of Educ.* to

argue that the failure to conduct social and emotional testing constitutes a serious procedural

violation. ECF No. 60 at 19. In *L.O.*, however, the court explained that testing was important

when "a child's behavior impedes learning" and noted that in that case, the student's "behavior

seriously interfered with his instruction," *L.O. v. New York City Dept. of Educ.*, 822 F.3d 95, 112

(2d Cir. 2016). In this case, any anxiety S.G. experienced did not seriously interfere with her

instruction. This is evidenced, in part, by the progress she made toward her goals and

objectives—as discussed fully in Section III.B.

Additionally, failure to conduct an assessment "does not render an IEP legally inadequate

under the IDEA so long as the IEP adequately identifies a student's behavioral impediments and

implements strategies to address that behavior." *M.W. ex rel. S.W. v. New York City Dept. of

Educ.*, 725 F.3d 131, 140 (2d Cir. 2013). In this case, S.G.'s IEPs identified weaknesses related

to her social and emotional deficits and included related goals. B-18 at 7 (noting that "[due to

[S.G.'s] limited self-advocacy and participation in class, accommodations and support are

needed in order for her to be successful in the classroom"); B-18 at 14-15 (noting that S.G.

would participate in counseling, learn to identify strengths and weaknesses, name coping strategies, participate in classes, and request assistance when needed); B-43 at 10 (noting that "[d]ue to [S.G.'s] executive functioning difficulties and limited participation in class, accommodations and support are needed in order for her to be successful in the classroom); B-43 at 19 (noting that S.G. would participate in counseling, work on self-advocacy, and identify her strengths and weaknesses). Moreover, Ms. Nadeau worked with S.G. on being assertive, responding to peer pressure and using constructive rather than deconstructive comments and judgments, stress management, coping skills, and dealing with everyday stressors. ECF No. 41-3 at ¶ 12; ECF No. 54 at ¶ 12.

Thus, not only did any anxiety S.G. experience not impede her learning, but the school provided social skills instruction. The failure to conduct additional social and emotional testing in this context is not a denial of FAPE.

### 5. NVLD Diagnosis

The Plaintiffs argue that the Board denied FAPE "when it failed to acknowledge [S.G.'s] diagnosis of NVLD and the many disabilities this diagnosis incorporates within the IEP." ECF No. 60 at 21. Dr. Ciocca diagnosed S.G. with NVLD in her 2016 evaluation, but acknowledged that NVLD is not in the Diagnostic and Statistical Manual. B-42 at 36; Ciocca Tr. 47, 90-92. She further diagnosed S.G. with pragmatic social communication disorder, other specified neurodevelopmental disorder (executive dysfunction, working memory, processing speed, sensory/visuomotor/perceptual deficits), specific learning disorder with impairments in math and reading comprehension, and unspecified anxiety disorder. B-42 at 36.

The Hearing Officer determined that the school's decision not to identify NVLD in the IEP was not a denial of FAPE because the PPT "did identify and address most of the various

deficits that Dr. Ciocca testified make up a nonverbal learning disability." ECF No. 1-1 at CL ¶¶ 31-32. Indeed, the school's decision not to list NVLD in S.G.'s IEPs does not constitute a denial of FAPE as long as it did not interfere with the school's ability to properly identify and address S.G.'s needs. *See D.B. v. Ithaca City Sch. Dist.*, 690 Fed. Appx. 778, 781 (2d Cir. 2017)(unpublished) (explaining that it did not matter if "the examining psychologist was dubious of the utility of an NVLD classification" because "the record indicates that those needs were appropriately identified and addressed"). As the record makes clear, the school identified and addressed in multiple IEPs the deficits later identified by Dr. Ciocca and made part of her diagnosis of NVLD. *See* Ciocca Tr. 48-52 (explaining that NVLD "has . . . multiple facets and components" and that children with NVLD tend to have trouble with executive functioning, social skills, motor skills, visual spatial integration, reading comprehension, mathematics, and aspects of writing); B-15 at 3 (discussing steps to address deficits related to social skills and reading ability); B-18 at 3 (discussing S.G.'s struggle with consistency and short-term memory as well as ways to address those issues); B-18 at 6 (discussing S.G.'s difficulty with visual-spatial skills); B-26 at 3 (discussing social skills, motor planning, and reading fluency); B-43 at 10 (discussing S.G.'s difficulty with executive functioning and noting that supports would be needed). As such, the decision not to list NVLD as a diagnosis on her IEP does not constitute a denial of FAPE.

### 6. Math Instruction

The Hearing Officer found that the Board committed a "procedural violation that deprived the Student of FAPE when it eliminated specialized instruction in mathematics from her ninth grade IEP." ECF No. 1-1 at CL ¶ 33. The Plaintiffs "believe the Hearing Officer was correct in asserting this procedural violation" and ask the Court to uphold this finding. ECF No.

60 at 22. The Board does not agree with this component of the Hearing Officer's decision, but chose not to appeal it. ECF No. 62 at 32; ECF No. 41 at 37. Although it is thus not necessary to address this issue, I do so because the Plaintiffs challenge the adequacy of the related compensatory education remedy ordered by the Hearing Officer – an issue I address below in Section III.C.

I agree with the Hearing Officer's determination that S.G.'s ninth grade IEP constituted a deprivation of FAPE due to its elimination of specialized math instruction. S.G. had received 45 minutes of math instruction each day in a special education small group setting during seventh and eighth grade. ECF No. 1-1 at FF ¶¶ 14, 38. In seventh grade, this enabled her to master her math-related objectives and make significant progress in math. ECF No. 1-1 at 32; ECF No. 1-1 at FF ¶ 26. In eighth grade, the impact of specialized instruction was less clear. The IEP reflected mastery of one math-related objective and satisfactory progress on two math-related objectives, ECF No. 1-1 at 37. However, the Hearing Officer found that "the evidence presented at the hearing was inconclusive" as to whether S.G. achieved adequate progress in math during eighth grade. ECF No. 1-1 at FF ¶ 68. And while testing results showed improvement in one subtest of the math testing, ECF No. 1-1 at FF ¶ 67, other results showed decline, ECF No. 1-1 at FF ¶¶ 64, 67. Ms. Olsen noted that this was unsurprising because "[a]s the level of tests became higher. . . the demands were harder and higher." Olsen Tr. 230. As a general matter, Ms. Olsen testified that S.G.'s math profile was complicated and it was "not fair to put her in a [particular] grade level, because she could do some things that were on grade level or above grade level . . . and then there were things that she continued to struggle with." Olsen Tr. 195.

Despite recognition of this complicated profile, S.G.'s ninth grade IEP called for placement in a regular education algebra class. ECF No. 1-1 at FF ¶ 101; Olsen Tr. 232. It is true

that this class would be co-taught by a special education teacher and a regular education teacher, cover algebra in two years instead of one year, would review some concepts from the previous year, and would only include 13 students. Olsen Tr. 231-32. Even with these supports, however, S.G.'s complicated profile and mixed test scores demonstrated that she would continue to need specialized math instruction in a more individualized setting. The failure to include such instruction in her ninth grade IEP would have resulted in a deprivation of benefits and is therefore a denial of FAPE. *R.C. ex rel. M.C.*, 906 F. Supp. 2d at 268.

To remedy this violation, the Hearing Officer awarded "compensatory education services in the form of specialized instruction in mathematics at the rate of .80 hours for each day that school was in session during the 2016-2017 School Year." ECF No. 1-1 at 31. I address the Plaintiffs' challenge to this remedy in Section III.C.

## B. Substantive Adequacy

The Plaintiffs allege that the Hearing Officer relied "on the wrong legal standard" in assessing the alleged substantive violations. ECF No. 60 at 24; ECF No. 1 at ¶ 182. Specifically, they contest the standard set forth in Conclusion of Law 38 of the Hearing Officer's decision. ECF No. 1 at ¶ 182. This paragraph, however, accurately quotes language from the Supreme Court's decision in *Rowley* that the IEP must "confer some educational benefit upon the handicapped child." *Rowley*, 458 U.S. at 200. Moreover, the Plaintiffs ignore Conclusion of Law 37 in which the Hearing Officer makes clear that the substantive inquiry is whether the student's IEP is "reasonably calculated to allow the Student to make appropriate progress in light of her individual circumstances." ECF No. 1-1 at CL¶ 37. This language mirrors the standard set forth in a more recent Supreme Court decision. *Andrew F. ex rel. Joseph F. v. Douglas County Sch. Dist.*, 137 S. Ct. 988, 999 (2017) ("To meet its substantive obligation under the IDEA, a school

must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances."). It further aligns with the Second Circuit's holding that "the substantive adequacy of an IEP is focused on whether an IEP was reasonably calculated to enable the child to receive educational benefits and likely to produce progress, not regression." *Mr. P. v. West Hartford Board of Education*, 885 F.3d 735, 757 (2d Cir. 2018). And it is clear from the opinion that the Hearing Officer applied that standard. ECF No. 1-1 at CL ¶ 43 ("The seventh and eighth grade IEPs were reasonably calculated to and did enable the student to make appropriate progress. . .").

Because the Hearing Officer applied the correct legal standard and canvassed the evidence carefully in a thorough opinion, her findings as to substantive adequacy are entitled to deference. *T.Y. v. New York City Dep't of Education*, 584 F.3d 412, 418 (2d Cir. 2009) (internal quotation marks and citation omitted) (explaining that because "administrative agencies have special expertise in making judgments concerning student progress, deference is particularly important when assessing an IEP's substantive adequacy"); *Walczak*, 142 F.3d at 129 ("Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful."); *Mr. P*, 885 F.3d at 748 ("Deference to the administrative decision is particularly appropriate when the administrative officer's review has been thorough and careful."); *M.H. v. New York City Dept. of Educ.*, 685 F.3d 217, 244 (2d Cir. 2012) ("[D]eterminations regarding the substantive adequacy of an IEP should be afforded more weight than determinations concerning whether the IEP was developed according to the proper procedures.").

### 1. Appropriate Progress: Seventh and Eighth Grades

The Plaintiffs argue that the Hearing Officer's finding of progress "is clearly erroneous." ECF No. 60 at 27; *see* ECF No. 1 at ¶ 159-164, 176-178. "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 999. The analysis centers on "whether the IEP is *reasonable*, not whether the court regards it as ideal." *Id.* I find that S.G.'s goals and objectives were reasonably calculated to enable progress and, in fact, S.G. made sufficient progress during the 2014-2015 and 2015-2016 school years.

The Plaintiffs point to S.G.'s scores on some standardized tests to argue that she was regressing. *See, e.g.*, ECF No. 60 at 27-29. However, the Hearing Officer explains that:

> 25. Level scores on standardized tests in successive years, including the Woodcock Johnson Test of Achievement, demonstrate that the tested subject has achieved expected growth in the tested skill relative to peers of the same age group. (B 3; B 34; B 25; T Murdica) Likewise, higher standardized scores over time generally reflect that the subject exhibited greater than expected development in the particular area, and lower scores reflect less growth compared to same aged peers (*Id.*) A reduction in a standardized score does not necessarily indicate that the subject has regressed in the tested skill (B 25)

ECF No. 1-1 at FF ¶ 25. Thus, the fact that some of S.G.'s scores on these standardized tests decreased does not necessarily mean S.G. was regressing rather than simply experiencing less growth than her peers. Comparing these scores across years is also difficult given the "complex nature of the Student's profile and the inconsistency of her performance." ECF No. 1-1 at CL ¶ 40; *see also id.* at FF ¶ 55. As Dr. Ciocca explained, "if you see her profile in general, there's a lot of scatter," meaning "[y]ou could give her one test that measures one thing one day and give her a similar test that measures that same exact thing a different day and there could be variance in that." Ciocca Tr. 20; *see also* B-42 at 37 (noting that "progress will likely be slow and inconsistent in achieving desired goals and objectives"). And finally, direct comparison of scores

from one year to the next was not always possible because some tests were updated or normed differently. ECF No. 1-1 at FF ¶ 54.

Despite these difficulties, the Hearing Officer engaged in a thorough review of S.G.'s progress by considering not only test results, but also curricular-based assessments and testimony from the school staff. In reviewing S.G.'s progress during seventh grade, the Hearing Officer noted that S.G. made significant progress in reading comprehension, writing, and mathematics, ECF No. 1-1 at FF ¶ 26, performed very well on a reading fluency assessment, *id*. at FF ¶ 27, and generally experienced growth in communication and motor skills, *id*. at FF ¶¶ 28-29. And while the occupational therapist reported that S.G. did not make appropriate progress regarding visual-motor coordination and visual-perceptual activities in seventh grade, standardized testing showed growth in almost all areas of motor and visual perception skills over both the seventh and eighth grade years. ECF No. 1-1 at FF ¶¶ 30-31. In reviewing her progress during eighth grade, the Hearing Officer found that S.G. improved in the area of reading comprehension, ECF No. 1-1 at FF ¶ 61, writing, *id*. at FF ¶ 63, expressive and receptive language skills, *id*. at FF ¶ 69, motor skills, *id*. at FF ¶ 73, and visual perception, *id*. at ¶ 74. She also determined, however, that the evidence was inconclusive as to S.G.'s progress in math. ECF No. 1-1 at FF ¶ 68. The Hearing Officer's overall finding that the "seventh and eighth grade IEPs were reasonably calculated to and did enable the Student to make appropriate progress and me[e]t the substantive requirements," ECF No. 1-1 CL ¶ 43, is supported by the evidence and entitled to deference. The Hearing Officer's finding of progress is also well-supported by the progress recorded in S.G.'s IEPs—in both the seventh and eighth grades, she either mastered or made satisfactory progress on the majority of her objectives. B-18 at 28-38; B-39 at 21-33.

Additionally, S.G. made honor roll and received mostly A's and B's in school. B-42 at 8; ECF No 1-1 at FF ¶ 32. Grades are an "important indication" of progress. *Mr. P*, 885 F.3d at 758. While it is not true that "every handicapped child who is advancing from grade to grade . . . is automatically receiving a [FAPE], the Supreme Court has explained that, when a child is mainstreamed in a regular classroom, the system itself monitors the educational progress of the child." *Id.* at 758-59 (internal quotation marks and citations omitted).

The Hearing Officer's decision regarding substantive adequacy is both entitled to deference and well-supported. Accordingly, I conclude that S.G.'s seventh and eighth grade IEPs were reasonably calculated to produce progress in light of S.G.'s circumstances and are substantively adequate.

### 2. Appropriately Ambitious Program: Ninth Grade

The Plaintiffs argue that S.G.'s ninth grade IEP "did not include appropriately ambitious goals, nor did it create an appropriately ambitious program for S.G." ECF No. 60 at 35. I disagree.

The Plaintiffs state that the occupational therapy component of the IEP was inadequate as "there was one goal with two objectives, one of which consisted of watching YouTube videos of hair braiding." ECF No. 60 at 35. The objective, reproduced below, is more detailed than the Plaintiffs represent:

> Following visual and verbal directions (ex. youtube video) [S.G.] will complete spatial organization/visual motor tasks (ex. construct, braid hair, functional tasks, draw, build, etc) presented with extra assist and cues for half the steps, improving from needing these directions and moderate assist with actual model.

B-43 at 20. The objective clearly does not suggest that S.G. would meet the objective merely by watching videos of hair braiding. Rather, the use of video was simply an example of how visual

and verbal directions would be presented. And braiding hair was only one example of a range of tasks related to motor skills that S.G. would work on. This objective is appropriately ambitious in light of S.G.'s documented difficulty with motor skills. B-5 at 4.

The Plaintiffs also argue that the counseling goal was inadequate as one of the stated objectives said "she will identify three strengths and weaknesses in her learning profile." ECF No. 60 at 35. While this is a limited objective, Ms. Nadeau explained that it would include implementing as well as naming coping strategies. Nadeau Tr. 117. Both Dr. Ciocca and the school staff agreed that S.G. requires programming to help her self-monitor and better understand her strengths and weaknesses. B-42 at 37; B-43 at 5. As such, identifying and implementing coping strategies is an important and appropriately ambitious objective.

The Plaintiffs further argue that the goals and objectives in the ninth grade IEP "did not address her deficits in decoding." ECF No. 60 at 35. The PPT summary in June 2016 agreed with the parents that S.G "continues to have some weakness in her decoding and encoding" but also noted that "testing by Dr. Lord, the school system and Dr. Ciocca shows that . . . [reading] comprehension continues to be a bigger issue." B-43 at 6. Nevertheless, the summary notes "that a WADE assessment could be administered at the start of the school year to determine areas of decoding that may need to be addressed more explicitly." B-43 at 6. The Board was well aware of S.G.'s strengths and weaknesses regarding reading, it was taking steps to obtain more information about her learning profile, and it specifically provided for use of an assessment regarding decoding.

The Plaintiffs also argue that the IEP did not address S.G.'s needs in the area of working memory. While there was no goal or objective geared specifically to addressing her memory deficits, the record shows that the school staff was well-aware of her memory problems and took

steps to address them. The PPT meeting held to discuss S.G.'s ninth grade IEP specifically addressed memory issues, B-43 at 6, 8, 10, and strategies adopted to cope with them, *id*. at 6 (referring to use of note card to help recite poem). In addition, goals and objectives in the IEP for reading and language implicitly incorporate memory-related activities. One language-skills objective notes that S.G. will "answer inferential questions as well as identify the main idea and 3 relevant details from a passage that has been read to her over 3 consecutive sessions" and another objective states that she "will demonstrate the ability to provide an antonym and word definitions when presented with 10 items per session." B-43 at 17. These objectives have to do with comprehension and language development, but also necessarily implicate memory skills. Similarly, one of the reading objectives indicates that S.G. "will demonstrate comprehension . . . by independently taking notes and orally summarizing what she has read." B-43 at 13. Requiring S.G. to summarize content both in writing and orally is consistent with Dr. Lord-Bean's evaluation that S.G. can "use her memory skills . . . provided that she has had adequate opportunity for practice/over-learning." B-14 at 10. Finally, the IEP clearly accounts for S.G.'s memory deficits in the instructional strategies section, where it lists the following strategies for S.G.: "extra drill/practice," "have student restate information," and "review directions." B-43 at 21.

Having reviewed the record, I conclude that the IEP was appropriately ambitious and was reasonably calculated to enable progress—except with respect to the math component as already discussed.

### 3. Bullying

The Plaintiffs argue that the Board denied S.G. a FAPE by failing to address bullying. ECF No. 60 at 33. "[U]nder IDEA the question to be asked is whether school personnel was

deliberately indifferent to, or failed to take reasonable steps to prevent bullying that substantially restricted a child with learning disabilities in her educational opportunities." *T.K. v. New York City Dept. of Educ.*, 779 F. Supp. 2d 289, 316 (E.D.N.Y. 2011). The record does not support a finding of such failures by school personnel.

The Plaintiffs state that "the staff forced S.G. to be in class with the student who was bullying her and even partnered with her in science." ECF No. 60 at 33-34; *see* ECF No. 1 at ¶ 48. As the Board pointed out, however, it appears that the "bully" merely annoyed S.G. ECF No. 62 at 26. On August 26, 2015, Mrs. G emailed Ms. Olsen stating that another student "REALLY annoys [S.G.] & the thought of a year with her in 3 classes isn't great." B-24 at 8. Ms. Olsen responded that "[S.G.] and [the other student] are in many of the same classes together because they both need to be in the academic skills class." B-24 at 8. Mrs. G's reply to that response did not suggest alarm or concern over bullying. B-24 at 9. Since the school staff were only told that this student annoyed S.G., their response was appropriate.

The parents also point to an incident in the lunch room one day when S.G. was out of school. ECF No. 1 at ¶ 74. On May 10, 2016, Mrs. G emailed Ms. Nadeau and Ms. Olsen about this incident, stating: "[i]t has been brought to my attention that yesterday during lunch another student started yelling about how [S.G.] has been absent from school" and called S.G. "a big baby" for not wanting to present a poem in class. B-41 at 6. Ms. Nadeau responded the following day to let Mrs. G know that she would refer the student if it was a discipline issue and that she would touch base with S.G. about the incident. B-41 at 6. Mrs. G responded that S.G. was not aware of the incident because it happened when she was not in school and requested that Ms. Nadeau not bring it up with her. B-41 at 7. Ms. Nadeau agreed not to discuss it with S.G. and explained that "unless [she] knew the student's name it [could] not be addressed." B-41 at 7. Just

a few hours later, Ms. Nadeau wrote that she had "received all the information [she] need[ed] from a concerned parent" and would "address the issue when [she] return[ed] tomorrow." B-41 at 7. These emails indicate that the school was responsive to Mrs. G's concern about an incident of which S.G. was apparently unaware. Ms. Nadeau quickly responded to the issue, explained the steps she would take to address it, and provided a timeline to the parents. This response meets the standard set forth in *T.K.*

### C. Compensatory Education: Specialized Instruction in Mathematics

The Hearing Officer found that S.G. was entitled to compensatory education as a remedy for the Board's failure to include daily specialized math instruction in the ninth grade IEP. ECF No. 1-1 at CL ¶ 62. The compensatory remedy was "specialized instruction in mathematics at the rate of .80 hours for each day that school was in session during the 2016-2017 School Year." ECF No. 1-1 at 31.

A hearing officer is permitted "to fashion an appropriate remedy for students not provided a FAPE, and the Second Circuit has held that compensatory education is an available remedy under the IDEA to make up for denial of a FAPE." *M.M. v. New York City Dept. of Educ.*, 2017 WL 1194685, at *2 (S.D.N.Y. Mar. 30, 2017). When reviewing an award of compensatory education by a hearing officer, the Court must determine whether it is "reasonably calculated to provide the educational benefits that likely would have accrued from special education services the school district should have supplied in the first place." *Id*. at * 6 (internal quotation marks and citations omitted). I find that the Hearing Officer's remedy is reasonably calculated to provide the benefits that would have accrued from the inclusion of appropriate math services in S.G.'s ninth grade IEP.

As discussed above, S.G.'s complicated math profile required specialized instruction. *See* Section III.A.f. Placement in a regular education algebra class—even one co-taught by a special education teacher that covered only half the standard curriculum—was not sufficient. *See* Section III.A.f. Thus, the inquiry is whether specialized math instruction at the rate of .80 hours per day is "reasonably calculated to provide the educational benefits" that would have accrued from the inclusion of math instruction in a special education small group setting in the 2016-2017 IEP.

The Plaintiffs argue that the remedy was not appropriate because "[m]ath tutoring by the same district who failed to program for her math disability in the first place, had no understanding of her needs, and where she regressed would not have made her whole." ECF No. 60 at 39. However, the school appropriately programmed for her disability for the previous two years and enabled her to make progress during seventh grade. And although S.G.'s progress in math was inconclusive in eighth grade in math, Ms. Olsen's testimony about her complicated math profile and the school's provision of a FAPE in all other areas suggests that the school does indeed understand S.G.'s needs. The Plaintiffs further state that S.G. "requires specialized programming with highly trained staff to remediate her math deficit." *Id.* The remedy, however, provides just that: specialized programming with trained staff. Finally, the Plaintiffs argue that this award "could not actually provide relief" because S.G. is currently attending a school in Rhode Island and "so could not benefit from tutoring being offered at the public school." ECF No. 1 at ¶ 191. As the Board notes, however, "such instruction could be provided at Middlebridge or any other location to which S.G. had access." ECF No. 41 at 38.

Thus, I find that the remedy set forth by the Hearing Officer is reasonably calculated to provide S.G. the educational benefits she is entitled to.

### D. Placement at Middlebridge and Tuition Reimbursement

Mrs. and Mr. G placed S.G. at Middlebridge as a residential student, ECF No. 1 at ¶ 134, and are seeking tuition reimbursement, ECF No. 1 at 51. Middlebridge is located in Rhode Island and about five to ten percent of the students are day students while the rest are residential students. ECF No. 1 at ¶ 135. "Parents seeking reimbursement for a private placement bear the burden of demonstrating that the private placement is appropriate." *Frank G. v. Bd. of Educ. of Hyde Park*, 459 F.3d 356, 364 (2d Cir. 2006). The Hearing Officer determined that the Plaintiffs did not meet this burden. ECF No. 1-1 at CL ¶ 57. I agree.

Under IDEA, "the court 'shall grant such relief as the court determines is appropriate.'" *Doe v. E. Lyme Bd. of Educ.*, 790 F.3d 440, 454 (2d Cir. 2015) (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)). Although an award of damages is unavailable, "a court may award various forms of retroactive and prospective equitable relief, including reimbursement of tuition, compensatory education, and other declaratory and injunctive remedies." *Id.* at 454.

"A state must fund a residential program for a disabled child when it is necessary for the child to make meaningful educational progress." *C.T. v. Croton-Harmon Union Free Sch. Dist.*, 812 F. Supp. 2d 420, 433 (S.D.N.Y. 2011). However, "[c]ourts in . . . the Second Circuit are reluctant to find that a residential placement is required in the absence of clear evidence indicating that such a placement is the child's only means of achieving academic progress." *Id.* The Plaintiffs argue that the residential component at Middlebridge focuses on "independent living skills and social-emotional skills" and "is necessary in order for [S.G.] to make educational progress, as social skills, organization, executive functioning and anxiety are areas that previously impeded her access to an education." ECF No. 60 at 38. However, as discussed above, S.G. was receiving social-emotional instruction at CMS in both individual and group

settings. ECF No. 41-3 at ¶ 12; ECF No. 54 at ¶ 12. Ms. Nadeau worked with her on being assertive, responding to peer pressure and using constructive rather than deconstructive comments and judgments, stress management, coping skills, and dealing with everyday stressors. ECF No. 41-3 at ¶ 12; ECF No. 54 at ¶ 12. Further, as discussed above, S.G. was making adequate progress. Thus, the record indicates that a residential placement was not necessary in order for S.G. to make progress.

Moreover, "IDEA's preference is for disabled children to be educated in the least restrictive environment capable of meeting their needs." *Walczak.*, 142 F.3d at 132. It is therefore "appropriate to proceed cautiously whenever considering such highly restrictive placements." *Id*. As discussed extensively in this decision, S.G. made progress in a much less restrictive environment—one that included a combination of special education classes and regular education classes. Indeed, Mrs. G appeared confident in S.G.'s ability to interact with non-disabled peers. In one email to Ms. Olsen from July 2015, she stated that "[w]e need to branch her away from the 'special ed' kids to try & be friends with others." B-24 at 3.

The record therefore does not support the Plaintiffs' contention that a private residential placement was warranted.

## IV.    Conclusion

For the foregoing reasons, the Defendant's motion for summary judgment is GRANTED and the Plaintiffs' motion for summary judgment is DENIED.

IT IS SO ORDERED.

                                                              /s/ MICHAEL P. SHEA
                                                             Michael P. Shea, U.S.D.J.


Dated:          Hartford, Connecticut
                March 11, 2019